# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TAMMY L. SHARPE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-cv-3304 |
| | ) | |
| NANCY A. BARRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Tammy L. Sharpe, appeals from the Defendant Commissioner of Social Security's final decision on her application for Social Security Disability Insurance Benefits under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423 (Disability Benefits). This appeal is brought pursuant to 42 U.S.C. § 405(g). Sharpe has filed a Brief in Support of Motion for Summary Judgment (d/e 13), and Defendant Commissioner has filed a Motion for Summary Affirmance (d/e 16). The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate and Reference Order entered November 30, 2016 (d/e 8). For

the reasons set forth below, the decision of the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

Introduction

Sharpe was born on June 18, 1969. Sharpe completed high school, although she took special education classes in high school. She previously worked as an assistant manager/cashier at a gas station and store. She last worked on October 27, 2011. She lived with her husband. She suffers from tremors, degenerative disc disease, asthma, history of possible sensory stroke, obesity, attention deficit hyperactivity disorder (ADHD), and borderline intellectual functioning. Certified Transcript of Proceedings before the Social Security Administration (d/e 11) (R.), at 14, 63-65, 232-33.

Evidence From Before the First Evidentiary Hearing

On February 2, 2012, Sharpe saw Dr. Walid Hafez, M.D., for a tremor in her hands and lower jaw. R. 369-72. Sharpe reported that the tremor leveled off after a procedure on her thyroid. Sharpe reported that her tremor became worse in the last month. She reported that she was having trouble writing and buttoning her clothes. She reported that she occasionally had a jaw tremor. Dr. Hafez noted, "However, overall she is

very happy and adjusted to her condition." R. 370. On examination, Dr. Hafez noted that Sharpe gained weight. Sharpe was 5 feet 3 inches tall and weighed 230 pounds 4.8 ounces. On examination, Sharpe's motor strength was good. Sharpe had cogwheeling at the neck, fine tremors in her hands and tension in her fingers. Dr. Hafez noted that Sharpe had no tremor when totally at rest. Sharpe had a mild intention tremor when she moved her hand. Sharpe's sensation was preserved. She had mild tremor placing a finger to her nose. Her handwriting also demonstrated a tremor. Dr. Hafez planned to recheck her thyroid hormone T4 level and prescribed Primidone. Dr. Hafez discussed tremor medication with Sharpe. He also discussed ways to improve Sharpe's tremor including using "weights at the wrists, relaxation, physical fitness, and 'defocusing' off the tremor." Dr. Hafez also scheduled Sharpe for physical therapy. R. 371.

On March 5, 2012, Sharpe saw Dr. Hafez. R. 365-68. She reported no change in her tremors, but sudden mood changes and sudden anger at others since she started taking the Primidone. Dr. Hafez discontinued the medication. Sharpe reported that her tremor was gradually worsening. Sharpe reported having problems picking up a glass of tea. Sharpe was "now very self-conscious about the tremor and worries that people are looking at her." R. 367. On examination, Sharpe had normal strength with

preserved sensation.  She was impaired on taking her finger to her nose with a mild intention tremor.  Dr. Hafez concluded that Sharpe "has most likely an essential tremor."  He changed her medications.  Dr. Hafez stated that Sharpe had a "fairly benign tremor and is not a candidate for deep brain stimulation."  Dr. Hafez encouraged Sharpe to engage in a fitness program and reduce her caloric intake.  R. 367.

On April 27, 2012, Sharpe saw nurse practitioner Jane Peterson, CNP.  R. 420-23.  Sharpe reported that she experienced an ice water sensation from her waist to her knee on the right side since the day before. Sharpe also reported bilateral pain in her feet for the last two weeks. Sharpe also reported back pain for over a month.  R. 420. On examination, Sharpe was alert, oriented, cooperative, and her memory function was normal.  Her breathing was normal, her gait was normal, and she could move all extremities.  Peterson assessed possible peripheral neuropathy. She ordered an MRI of the lumbar spine.  R. 422-23.

On May 4, 2012, Sharpe was admitted to Blessing Hospital in Quincy, Illinois, for paresthesis, and possible stroke.  A CT scan of her head showed no intracranial hemorrhage, mass, or mass effect.  The CT scan showed no acute intracranial abnormality.  The CT scan report states that Sharpe had a clinical history of right-sided leg weakness, right-sided facial

numbness, and lightheadedness.  R. 332.  An ultrasound of her carotid arteries showed no significant carotid artery stenosis.   She was discharged on May 5, 2012. R. 334.

On May 8, 2012, Sharpe saw Dr. Hafez.  R. 361-64.  Sharpe reported numbness from her right hip to her right knee, with a feeling of ice water and warm water running over it.  Sharpe reported that the sensation moved up to her arm and right face.  She reported tremors, weakness, difficulty urinating with leakage, dizziness, tingling and numbness in her right ear, and problems swallowing.  R. 361.  On examination, Sharpe's motor strength seemed good and symmetrical.  Sharpe felt stimuli to the right side of her face as a tingling sensation.  Sharpe had less perception of sharp and dull stimuli in the right lower extremity and less so over the right upper extremity.  Dr. Hafez noted that Sharpe's coordination was "definitely impaired."  Sharpe's gait was good.  She limped because of the pain in her right knee.   Dr. Hafez concluded that Sharpe could have a mild sensory stroke, except the May 4 and 5 CT scan and carotid artery ultrasound were normal.  R. 364.

On May 18, 2012, Sharpe underwent an echocardiogram.  The test showed normal heart function and an ejection fraction of 60 percent.  R. 335-37.

On June 1, 2012, Sharpe underwent a lumbar puncture for a biopsy of spinal fluid.  The procedure report noted that Sharpe had a clinical history of paresthesia and urinary incontinence.  R. 341.  The results of the lumbar puncture biopsy was negative.  R. 402.

On June 12, 2012, Sharpe went to see Peterson.  Sharpe had multiple questions regarding recent test results.  Sharpe reported that she was feeling better but continued to have numbness in her right leg and tremors.  Sharpe reported that she had twitching in her right eyelid and fatigue.  Peterson did not conduct a physical examination during this visit. The same day Sharpe underwent an MRI of her thoracic spine.  The MRI showed left-side bulging disk at T6-7 of doubtful clinical significance.  The scan was otherwise normal.  R. 342.

On June 21, 2012, Sharpe saw Dr. M. Ali, M.D., for a hypercoagulable state.  R. 402-05.  Dr. Ali noted that Sharpe had heterozygous factor V Leiden gene mutation and history of sensory stroke. Dr. Ali noted that Sharpe had undergone MRIs of her carotid artery, brain, and thoracic spine.  He noted that the scans were all normal except for the bulging disc at T6-7, which he said was "probably insignificant."  Dr. Ali also noted that the lumbar puncture results were negative.  Dr. Ali stated that Sharpe's "hypercoagulable state revealed heterozygous factor V gene

mutation." She took aspirin for this condition. Sharpe reported the she still had some numbness in her right lower extremity, but the rest of the numbness "actually has been somewhat resolved." R. 402.

On examination, Sharpe's strength was symmetrical in all extremities. She had somewhat decreased sensation in the right lower extremity. Dr. Ali noted "some impairment of coordination with questionable positive finger-nose-finger test on right side." Sharpe's gait was normal. Dr. Ali assessed hypercoagulable state. Dr. Ali recommended continuation of the aspirin and additional testing. R. 404-05.

On July 2, 2012, Sharpe saw Dr. Hafez for a follow up visit. R. 357-60. Sharpe reported that the numbness in her right side had subsided except "outer aspect of strip knee up to thigh still numb." Dr. Hafez noted that the MRI, lumbar puncture and other testing was generally negative except for the factor V Leiden mutation and mild bulging of a thoracic disc without cord compression. Dr. Hafez noted that Sharpe's condition "if anything has improved." Dr. Hafez summarized:

> The patient's condition if anything has improved. She is left now with a patch of numbness from the proximal part of the thigh laterally down to the right knee, down to the mid-leg laterally. There is no pain. She is fairly comfortable and she is capable of doing things the way she does without problem. She, however, still has issues with memory.

> Her review of systems apart from these two issues is negative.
> She is trying to eat healthy foods.

R. 359. Dr. Hafez performed a formal SLUMS mental status examination.

Sharpe scored 27 out of 30.[1] Dr. Hafez said concerning the test results.

> This may be an expression of mild cognitive impairment the
> test, but her score which was 27 out of 30 is still in the normal
> range. Most likely this problem is related to decreased
> attention.

R. 306. Dr. Hafez could not diagnose any cause of Sharpe's condition:

> We reviewed all those results with the patient. At the present
> time I am unable to apply a specific diagnosis to the patient's
> complaint. This could have been the result of her minor
> vascular event or viral infection. I do not have evidence for
> strokes, ongoing inflammatory disease like MS, etc.

R. 360.

On July 18, 2012, Sharpe saw Dr. Ali for a follow up. R. 373-74. Dr.

Ali noted that he completed the additional testing for Sharpe's

hypercoagulable state. The additional testing was negative. Sharpe

reported that she still had some shooting pain in her right lower extremity.

Sharpe reported no other new symptoms. R. 373. Dr. Ali recommended

continuation of the daily aspirin. R. 374.

---

[1] SLUMS stand for St. Louis University Mental Status examination. See
aging.slu.edu/pdfsurveys/mentalstatus.pdf, viewed December 19, 2017.

On August 1, 2012, Sharpe completed a Function Report—Adult Form. R. 242-49. Sharpe reported that she had a hard time walking down stairs due to her tremors and partial numbness in her right leg. She said that the heat "makes my asthma act up." She said she got dizzy bending over due to vertigo. She said she had no strength on her right side due to a lumbar puncture test. R. 242. Sharpe reported that she let the dogs out and did laundry during the day. Otherwise, she sat and rested. She did not drive due to her vertigo, numbness, and tremors. R. 243. She reported that she had problems sleeping due to lower back pain, leg pain, and severe headaches. R. 243. She said she had trouble remembering to take her medications. She said she made sandwiches and heated leftovers. She did not cook more extensively because she could not stand for long periods. R. 244.

Sharpe said she did not do yardwork because of her asthma. She went outside once a day, but more often in cool weather. She went grocery shopping once a month. R. 245. She opined that she could lift five pounds, walk 10 yards, pay attention for five minutes or less. She could not follow spoken instructions but could follow written instructions, but demonstrations worked best. R. 247.

On September 28, 2012, Sharpe saw psychologist Dr. Frank Froman, Ed.D., for a consultative examination (CE) and mental status examination (MSE).  R. 375-84.  Dr. Froman stated that, "Tammy presented as a somewhat anxious individual who appeared to put forth a very strong effort, trying to do better each time, and became angry with herself when she did not know what to say or do.  Anxiety definitely interfered with her performance."  R. 376.  Dr. Froman administered a Wechsler Memory Scale-Fourth Edition test.  Dr. Froman stated that the test results showed "unusually poor memory virtually 'across the boards.'"  R. 383.  Dr. Froman diagnosed probable dementia of unknown origin, borderline intellectual functioning by interview, and a current Global Assessment of Functioning (GAF) of 45.[2]  R. 383.  Dr. Froman opined:

> **CONCLUSIONS:** Tammy does not appear able to perform one or two step assemblies at a competitive rate. She is able to understand simple oral and written instructions, but will not be able to retain them without "writing them down or looking at them." She can get along with other people adequately, and seems to be able to manage her own benefits. I strongly doubt that she would be able to withstand the stress associated with customary employment until such time as we have a more clear understanding as to what might be causing her memory loss.

---

[2] The GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness.  American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) at 32-35.  The American Psychiatric Association no longer recommends use of the GAF score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

R. 384.

On October 5, 2012, state agency physician Dr. Richard Lee Smith, M.D. prepared a Physical Residual Functional Capacity Assessment. Dr. Smith opined that Sharpe could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb stairs and ramps; and frequently balance, stoop, kneel, crawl, and crouch. Dr. Smith opined that Sharpe had no manipulative limitations. R. 97-98.

On October 5, 2012, state agency psychologist Dr. Joseph Mehr, Ph.D., prepared a Mental Residual Functional Assessment. R. 98-100. Dr. Mehr opined that Sharpe was markedly limited in understanding and remembering detailed instructions; not significantly limited in remembering locations and work-like procedures; and not significantly limited in understanding and remembering short and simple instructions. R. 99. Dr. Mehr opined that Sharpe was not significantly limited in her ability to carry out simple and short instructions. He opined that she was moderately limited in carrying out detailed instructions. He opined that Sharpe was moderately limited in her ability to maintain attention and concentration for extended periods.

Dr. Mehr explained:

This woman performs very poorly on cognitive tests at a MSE which is in direct contrast to her capacity when assessed by her treating physician. She is oriented times three, presents as mentally impaired at a CE MSE but is fairly independent in activities of daily living. Her issue at the CER (sic) MSE may be the result of ADHD which is diagnosed by her treating source. She retains enough mental capacity necessary for remembering work locations and work related procedures and she has the cognitive capacity to understand and remember instructions for simple one and two step work of a routine and repetitive type.

She also retains sufficient attention and concentration to persist at and complete work activities for the periods of time required in the general work force. This lady retains the capacity for adequate pace and perseverance to maintain a schedule and on time attendance, and to complete a normal work day and work week on a consistent basis. She is able to perform at minimally acceptable rates, requiring only the common frequency and lengths of rest breaks. Psychologically based symptoms would not markedly impair her capacity to complete a normal work week.

These findings complete the medical portion of the disability determination.

R. 99-100.

On October 31, 2012, Sharpe saw Peterson for a medicine check.

Sharpe reported she was having some problems with her asthma. On

examination, Peterson noted some wheezing, but normal respiratory effort

with no rales or rhonchi. R. 392. Peterson noted Sharpe had a normal gait

and could move all her extremities. Peterson prescribed a seven-day

course of prednisone for the asthma.  Peterson also told Sharpe to continue seeing Dr. Hafez.  R. 393.

On November 27, 2012, Sharpe saw Peterson for low back pain. Sharpe reported that she had experienced problems with low back pain for months.  Sharpe reported that she had no numbness or tingling in her back. On examination, Sharpe had trouble with heel and toe walk, but no pain on palpitation of lumbar and thoracic spine. The pain was located on the upper right side of her back.  Peterson recommended exercises, ice, and/or heat.  Peterson prescribed hydrocodone-acetaminophen and meloxicam for the pain.  R. 387.

On February 4, 2013, Sharpe completed another Function Report— Adult Form.  R. 283-90.  Sharpe's daughter Adrian McCleery filled out the form for her.  R. 290.   Sharpe said her asthma, poor memory, weakness on the right side, tremors, headaches, and bladder leakage kept her from working.  R. 283.  She reported that she had trouble dressing herself because she had trouble standing and bending.  She sometimes had to use a spoon to feed herself because of her tremors.  R. 284.  Sharpe prepared a meal once or twice a week.  Her husband did most of the cooking.  She did laundry, but her husband took the clean clothes out of the dryer.  R. 285.  She did not usually drive because of her tremors and

vertigo.  R. 286.  Sharpe reported that she could walk 25 feet. She said she could follow a recipe, but had to keep rereading it.  She said she could not follow spoken instructions.  R. 288.

On February 11, 2013, state agency psychologist Dr. Mary Sandra Story, Psy.D., prepared a Mental Residual Function Assessment.  R. 112-13.  Dr. Story agreed with Dr. Mehr's October 2012 assessment.  Dr. Story recited verbatim the analysis of Dr. Mehr quoted above.  R. 113.

On February 13, 2013, state agency physician Dr. David Bitzer, M.D., performed a Physical Residual Functional Capacity Assessment.  R. 110-12.  Dr. Bitzer agreed with Dr. Smith's October 2012 assessment except Bitzer opined that Sharpe could only occasionally stoop rather than frequently stoop.  R. 111.

On April 7, 2013, Sharpe's daughter Adrian McCleery submitted a written statement regarding Sharpe.  R. 396-98. McCleery opined that Sharpe could not work.  McCleery stated:

> She doesn't remember a lot of things, almost like short term memory loss.  You can tell her one thing one min. and the next min. she had forgotten already.  Her tremors are so bad that she can barely keep food on the utensils.  She is constantly short of breath, and has a hard time breathing.

R. 396.  She stated that Sharpe had pain "everywhere sometimes."

McCleery stated that Sharpe stayed in bed and slept to deal with the pain.

R. 396. McCleery opined that Sharpe could walk for 10 minutes or less than one fourth of a mile, stand for 15 minutes, and sit for 30 minutes. McCleery stated that Sharpe had trouble gripping and holding objects. R. 397. McCleery stated that Sharpe could not remember what McCleery told Sharpe from one day to the next. R. 398.

From April 29, 2013, through November 6, 2013, Sharpe saw Peterson or a doctor for various problems including asthma, heartburn, leukocytosis and a lump in her breast and a lump in her neck. R. 488-92, 493-97,498-501, 506-11, 512-16.

On November 26, 2013, Sharpe saw Dr. Ali for the lump in her neck. Sharpe reported feeling weak, fatigued and tired. Sharpe reported drenching night sweats three or four times in the preceding month. R. 483. Dr. Ali assessed leukocytosis and lymphangitis. Sharpe had high white blood cell counts in the past, but the counts were normal on the day of examination. Dr. Ali recommended imaging studies. He ordered CT scans of the neck, chest, abdomen and pelvis. R. 486. On December 1, 2013, Sharpe saw Dr. Ali for a follow up appointment. Dr. Ali noted that the CT scans were generally negative. Sharpe's white blood cell count was again within normal limits. Sharpe continued to complain of fatigue. Dr. Ali suspected sleep apnea. R. 479-81.

On January 3, 2014, Sharpe was hospitalized with shortness of breath. On examination at the hospital, Sharpe had equal strength in her extremities and normal range of motion. R. 531. Sharpe was put on oxygen protocol and breathing treatments. R. 532. Sharpe was discharged on January 7, 2014. The final diagnosis was viral pneumonia and acute exacerbation of possible asthma. R. 531-34.

On January 15, 2014, Sharpe saw Peterson for a follow up appointment after the hospitalization. R. 475-77. Sharpe reported that she still had a cough and was tired but doing better. She reported trouble sleeping and pain in her tongue. Peterson prescribed Tylenol PM to help with sleep and nystatin oral rinse for the tongue. R. 477.

On March 13, 2014, Sharpe saw Dr. Austin Hake, M.D., for numbness in her right leg with occasional weakness. Sharpe reported daily headaches and tremors in her hands, right leg, and chin. R. 578. On examination, Sharpe had normal strength in her extremities, normal sensation, and normal gait. R. 581. Dr. Hake ordered an MRI of the brain and cervical spine. Dr. Hake noted Sharpe's tremor was mild and previously tried medication. Sharpe declined to try medication again. R. 583.

On March 19, 2014, Sharpe underwent an MRI of her cervical spine. The MRI showed mild bulge of the C6-C7 disc, borderline central spinal stenosis at C4-C5 and C5-C6 and narrowing of the C5 and C6 neural foramina, no cord compression, and multilevel degenerative disc disease. R. 612.

On March 20, 2014, Sharpe saw Dr. Elie Chbeir, M.D., for her asthma. Dr. Chbeir told Sharpe her asthma was not well controlled because of the frequency of her use of her albuterol inhaler. Dr. Chbeir recommended avoiding allergy triggers and perhaps seeing an allergist for treatment of her allergies. R. 576.

On May 7, 2014, Sharpe saw nurse practitioner Peggy Miracle, CNP for reevaluation of her allergies and asthma. A screening spirometry showed a Forced Vital Capacity (FVC) of 2.64, 81% of predicted; and Forced Expiratory Volume in one second (FEV1) of 1.99 or 73% of predicted.[3] Miracle stated that this represented a significant decline in both FVC and FEV1, but also stated that Sharpe had a mild impairment. R. 568.

On May 14, 2014, Sharpe saw Dr. Austin Hake, M.D., for an EMG and nerve conduction test. Sharpe reported neck and back pain. The test showed mild carpal tunnel syndrome in her right hand, but no evidence of

---

[3] See 20 C.F.R. Part 404 Subpart P, Appendix 1, § 3.00 E.

radiculopathy, polyneuropathy, or entrapment neuropathy.  R. 663.  On May 16, 2017, Sharpe underwent an MRI of her lumbar spine.  The MRI showed minimal disc bulge at L4-L5 with no significant compromise of the root canal.  R. 661.  In May and June 2017, Sharpe went to physical therapy sessions regularly for her back and neck.  R. 627-51.

On June 18, 2014, Sharpe saw Dr. Hake for a follow up.  Sharpe reported that her back and neck pain were better since she started physical therapy.  Sharpe reported a couple of bad headaches that week.  Dr. Hake noted that her headaches had improved, and her tremor was better if she ignored it.  Her inhaler made her tremor worse.  Dr. Hake stated that she had marked improvement in her back pain, and her carpal tunnel symptoms improved with wearing a wrist brace.  R. 622.

On August 12, 2014, Sharpe saw Dr. Kreg Love, DO.  Sharpe reported burning sensation in the front of her right leg.  Walking made the pain worse.  On examination, straight leg raising testing was negative and her leg was not tender to palpitation and had normal sensation.  Dr. Love concluded the leg pain sounded like neuropathy.  He recommended gabapentin and follow up with a neurologist.  R. 671.

On September 10, 2014, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. R. 59-90. Sharpe appeared with her counsel. Vocational expert Gary Weimholt also appeared. R. 59.

Sharpe testified at this hearing. Sharpe said that she was married. She had three adult children. Sharpe stated that she completed high school, but was in special education classes. She lived in a mobile home with her husband. She said she was 5 feet 4 inches tall and weighed 233 pounds. She indicated that she gained 120 pounds since the beginning of 2012. She stated she gained the weight because of thyroid problems. R. 63-65, 66-67.

Sharpe testified that she last worked in October 2011. She was "the assistant manager/kitchen cashier help" at a Casey's gas station and general store. R. 65. She testified that she was fired because of theft. She took money to pay her electric bill. She got caught before she could return the money. She said that she never stole money before or since that incident. R. 66. She testified that she applied for other jobs, but could not get hired because of the theft. R. 67.

Sharpe said she became disabled in the beginning of 2012. She said her health issues started then, "My breathing was getting worse. The

tremors were bad and my neck wasn't letting me move like it's supposed to, and then my lower back and leg."  R. 67-68.  She said that her tremors in her hands got worse when she tried to write, pick up objects, or hold objects.  R. 73.

Sharpe testified that she also always had problems with her memory. She said the memory problems had gotten worse over time.  She stated that when she worked at Casey's she kept a memory book.  She said, "I had a little memory book that I wrote everything down on how to do things." R. 68.

Sharpe said that her memory had gotten worse since she was fired from Casey's.  Sharpe said:

> I don't remember a lot of things anymore. I get stuck on when I'm talking in a sentence to somebody, I get stuck and stop and have to think of what I was talking about. Remembering dates, I have to write everything down. My husband helps me remind -- remind myself.

R. 69.  Sharpe testified that she had problems completing tasks at home. She would get "sidetracked" and then forget what she was doing.  R. 69. She said she often had problems remembering whether she loaded the dishwasher or ran the dishwasher once it was loaded.  R. 71.

Sharpe said that she took longer to perform household chores like laundry.  She said that she could not stand for very long.  She had to take breaks or lay down because she was dizzy.  R. 69.

Sharpe testified she had tremors in her chin, her right hand, and her right leg.  She said she had problems with her grip strength.  She could not crochet or grip things any more.  She stated that she could only crochet for 5 minutes before her hand cramped up.  R. 72, 74.  She said she also had pain and numbness in her right wrist, thumb, and finger.  She said her fingers went numb when she tried to crochet.  R. 73.  She said she had to stop and wait ½ hour to an hour before she could use her hand again.  R. 74.  Sharpe testified that her tremors in her chin were not noticeable if she was relaxed.  R. 73.

Sharpe also said she had pain in her back.  She testified that she had pain in her lower back when she moved her right leg or sat too long.  She said her right leg went numb if she stood too long.  She stated she could only sit for 10 to 15 minutes before she had to get up or shift positions.  If she pushed herself, Sharpe said she could sit 20 to 25 minutes before getting up.  She testified that she could stand 5 to 7 minutes.  R. 74-75.  She said that her attorney instructed her to time herself standing.  R. 82.  She said that got a burning sensation after three to five minutes of standing

and then her left leg would go numb.  She also felt pain in her hip when standing.  R. 82-83.  She said she always had pain in her lower back and hip.  R. 84.

She testified she had trouble walking because of her breathing problems.  She said she could walk 25 yards to her mailbox at home, but she had to rest and catch her breath before she walked back to her house. She also said that extreme weather took away her breath.  R. 76.  She experienced problems with high humidity.  She also had problems with dust from fields, cleaning chemicals, and any kind of aerosol.  R. 78.  She said that on an average day she used her rescue inhaler about twice.  She also took Spiriva and Dulera daily for her breathing problems.  She testified that her breathing problems were worse in 2012, got better, and then got worse again.  R. 77.

She opined that she could lift maybe two pounds.  She said she could not lift 10 pounds because her hand would start shaking.  She said that she did not lift milk bottles or soda bottles. She testified that she lifted a gallon tea container when the container was half-full or lower.  R. 78-79.

She testified that her medication gabapentin made her drowsy.  She did not take gabapentin the day of the hearing because she drove herself to the hearing and she did not want to be drowsy.  R. 80-81.

Sharpe said she had trouble concentrating when watching television. She testified that she also forgot an appointment for a sonogram. She said that she wrote "everything down," but she still forgot about the appointment. Her daughter remembered. R. 81.

Sharpe said she could not turn her neck to the left. She said she had trouble driving because she could not turn her head to the left to check her blind spots. She said that her neck also hurt if she looked down for more than a moment. R. 82.

Sharpe said she put laundry in the washer and dryer once a week. She opened the door to let the dogs in or out. She said that she and her husband prepared meals on the weekend and used the microwave during the week to heat up the food. She loaded the dishwasher, but did not wash dishes by hand. She mopped floors and did some sweeping. R. 85-86. Sharpe left the house once a week to run other errands with her husband. Her husband usually drove. She said she only drove if she had an appointment and no one could take her. Her husband usually did the grocery shopping. She said her daughter-in-law also bought food for them. She said that if she went grocery shopping, it usually took 10 to 15 minutes. R. 88-89.

Sharpe testified that during a typical day she watched television, crocheted, and read crochet patterns.  She used the Internet on her phone occasionally to look for patterns.  R. 87.  Sharpe said she was not sure if she could work if her only problem was her memory loss.  R. 87-88.

The ALJ concluded the hearing after Sharpe's testimony.  R. 89.  Vocational expert Weimholt did not testify at the hearing.

Evidence From After the First Hearing

On September 24, 2014, Sharpe saw Dr. Chbeir for her asthma.  She said her allergy and asthma symptoms had gotten worse due to the corn harvest.  Sharpe reported that she was on desensitization shots.  Dr. Chbeir prescribed prednisone for her excessive cough.  R. 701-02.

On November 11, 2014, Sharpe saw nurse practitioner Peterson for cough and sore throat.  Peterson diagnosed acute bronchitis and acute pharyngitis.  She prescribed Levaquin.  R. 713-16.

On November 15, 2014, Dr. Raymond Leung, M.D. examined Sharpe and prepared a Medical Source Statement.  R. 680-89.  On examination, Sharpe could walk 50 feet unassisted, but walked with a mild limp.  Straight leg raising was 20 degrees with the right leg and 50 degrees with the left.  She had decreased range of motion with her lumbar spine.  She had no muscle atrophy.  She had intentional tremors with her hands, mild on the

right and mild to moderate on the left.  She could oppose the thumb to each finger.  Her pinch and grip strength was 4+/5 on the left and 4/5 on the right.  Sharpe's sensation was within normal limits.  R. 682.  She could manipulate small objects with her hands "fairly well."  R. 683.

Dr. Leung opined Sharpe could lift 10 pounds frequently and up to 50 pounds occasionally; sit eight hours in an eight-hour workday; stand two hours at one time and a total of four in an eight-hour workday; and walk one hour at one time and a total of two hours in an eight-hour workday.  Dr. Leung opined that Sharpe could continuously reach, handle, and finger with her left hand, and frequently reach, handle and finger with her right hand. He opined that she should never climb stairs, ramps, ladders, or scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and crawl.  Dr. Leung opined that Sharpe could not tolerate unprotected heights or exposure to dust, odors, fumes, and pulmonary irritant; and could occasionally tolerate humidity and wetness, and extreme cold and heat.  R. 684-88.

On December 30, 2014, Sharpe saw Dr. Chbeir for a follow up on her asthma.  Sharpe reported no exacerbations in the last three months.  She reported a hacking cough for the last three weeks.  She had occasional wheezing and coughing, and some shortness of breath with exertion.  Dr.

Chbeir concluded that Sharpe was doing better. Dr. Chbeir adjusted Sharpe's medication. R. 718-19.

On January 21, 2015, Sharpe saw Peterson for swelling in her legs. Peterson prescribed a diuretic and compression stockings. R. 729-33. On February 10, 2015, Sharpe saw Peterson for a follow-up on the swelling. Sharpe reported the swelling was somewhat better. She reported that she could not tolerate the compression stockings and would check on the measurement for the stockings. Sharpe reported that she was exercising. Sharpe had an appointment scheduled with a dietitian. Peterson told her to keep the appointment and to elevate her legs as much as possible. R. 738.

The Second Evidentiary Hearing

On June 2, 2015, the ALJ conducted a second evidentiary hearing. R. 33-58. Sharpe appeared with her attorney along with vocational expert Denise A. Bieber. R. 33. At the beginning of the hearing, Sharpe's counsel stated that Sharpe had no significant changes in her symptoms. R. 36.

Bieber testified at this hearing. The ALJ asked Bieber the following hypothetical question:

> Q . . . I have a hypothetical question for you. Please consider a hypothetical individual, 47 years of age, with a high school education, no relevant past work . . . . Please assume that individual would be able to lift and/or carry, push, pull 20 pounds occasionally, 10 pounds frequently. The individual would be able to stand and/or walk for two hours in an eight

> hour workday, sit for six hours in an eight hour workday. The hypothetical individual would be occasionally able to climb ramps and stairs, but no ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch, and crawl. Please further assume the hypothetical individual would be able to frequently reach, handle, and finger. The hypothetical individual that I'm describing would need to avoid concentrated exposure to smoke, fumes, dust, gasses, hazards, such as dangerous machinery or unprotected heights. I would like ·you to further assume the hypothetical individual I'm describing would be able to understand, remember, and carry out simple instructions. . . .
> . . . .
> Q Please tell us, in your opinion, would the hypothetical individual I've described be able to perform unskilled occupations in the national economy?

R. 36-37.  The ALJ added that the person would be limited to frequent reaching, handling, and fingering.  R. 38.  Bieber opined that such a person could perform jobs in the national economy.  Bieber opined that the person could perform a dowel inspector job, with 16,500 such jobs in the national economy; a catcher job in the household appliance industry, with 41,625 such jobs in the national economy; and a lens inserter job, with 12,000 such jobs in the national economy.  R. 39.

The ALJ asked Bieber to assume that the person could only engage in fingering occasionally.  Bieber opined that such a person could perform the dowel inspector job, but no other sedentary jobs.  Bieber opined that such a person could also perform the job of garment sorter, with 27,500 such jobs in the national economy; and a folding machine operator clerical

job, with 75,000 such jobs in the national economy.  R. 40.  Bieber opined that all of these jobs would be one and two-step assembly-type jobs.  R. 43.

Bieber opined that the hypothetical person could not work if she required extra breaks during the day beyond the norm.  Bieber opined that the person could not work if she was off-task 20% of the time. R. 41.  Bieber opined that the person could not miss more than seven workdays in the first year of employment.  R. 42.

The hearing concluded.  R. 57.

## THE DECISION OF THE ALJ

On June 17, 2015, the ALJ issued his decision.  R. 12-27.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to her prior work

considering her age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th

Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir.

2005).

The ALJ found that Sharpe met her burden at Steps 1 and 2.  She

had not engaged in any substantial gainful activity since the day she

alleged she became disabled, January 1, 2012, and she suffered from the

severe impairments of tremors, degenerative disc disease, asthma, history

of possible sensory stroke, obesity, ADHD, and borderline intellectual

functioning.  R. 14.  The ALJ found that Sharpe's impairments or

combination of impairments did not meet or medically equal a Listing.  R.

16-18.

> At Step 4, the ALJ determined that Sharpe had the following RFC:
>
> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to lift
> and/or carry 20 pounds occasionally and ten pounds frequently;
> stand and/or walk for two hours out of an eight hour work day;
> sit for six hours of an eight hour work day; occasionally climb
> ramps and stairs, but no ladders, ropes or scaffolds;
> occasionally balance, stoop, kneel, crouch, and crawl; and
> frequently reach, handle, and finger. She must avoid
> concentrated exposure to smoke, fumes, dusts, and gases and
> hazards such as dangerous machinery or unprotected heights;
> and she can understand, remember, and carry out simple
> instructions.

R. 18.  The ALJ relied on the MRIs and other radiological studies that

showed mild problems.  The ALJ also relied on the examinations by

Sharpe's treating physicians that showed mild or benign physical problems

as well as a mild cognitive impairments within normal limits.  The ALJ also

relied on Dr. Leung's consultative examination.  R. 20-21.  The ALJ gave

little weight to Dr. Froman's assessment because his opinions were not

supported by any other evidence in the record.  R. 23, 25.  The ALJ also

gave limited weight to the opinions of psychologists Drs. Mehr and Story, and Drs. Smith and Bitzer. The ALJ found that Sharpe's RFC was more limited than the limitations opined by these health care professionals. R. 25.

The ALJ also determined that Sharpe's testimony about the limiting effects of her symptoms was not totally credible. The ALJ found her claimed limitations with her hands was inconsistent with her use of a walking stick, her ability to prepare meals, and her ability to use her phone to get on the Internet. The ALJ found that her level of daily activity was inconsistent with her testimony that she had very limited ability to sit, stand, walk, lift, or carry. R. 24. The ALJ noted that Sharpe's asthma, ADHD, tremors, borderline intellectual functioning were longstanding problems, and Sharpe was able to work in the past. The ALJ noted that Sharpe did not stop working because of an inability to work, but because she stole from her employer. The ALJ also noted that Sharpe testified that she could not find work because of the history of the theft, not because of her limitations. R. 24.

The ALJ considered the statement by Sharpe's daughter Adrian McCleery. The ALJ discounted the statement because McCleery was not a

medical professional, was not disinterested, and because McCleery's statement was inconsistent with the medical evidence.  R. 24.

After reviewing the evidence, the ALJ explained the basis for his RFC finding:

> Based on the totality of the evidence, the undersigned has determined the claimant's residual functional capacity. Because of the claimant's tremor, history of possible sensory stroke, degenerative disc disease, asthma, and obesity, the undersigned finds she should be limited to occupations requiring her to lift and carry no more than 20 pounds, due to her documented right sided weakness with tremor. Furthermore, as an added precaution, the undersigned has limited the claimant only occasional climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds; only occasional balancing, stooping, kneeling, crouching, or crawling; and no more than frequent reaching, handling or fingering.  Because of her asthma, the claimant should have no concentrated exposure to pulmonary irritants.  Because of her pain and diminished coordination, she should avoid hazards. Finally, because of her moderate restriction in concentration, persistence and pace, the undersigned finds she should be limited to occupations requiring her to understand, remember, and carry out only simple instructions.  The undersigned finds these limitations to be reasonable accommodation for someone with the claimant's impairments.  Weighing all relevant factors, the undersigned finds that claimant's subjective complaints do not warrant any additional limitations beyond those established in the residual functional capacity previously outlined in this decision.

R. 25-26.  The ALJ concluded at Step 4 that Sharpe could not return to her prior work.  R. 26.

At Step 5, the ALJ found that Sharpe could perform a significant number of jobs in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of vocational expert Bieber. The ALJ found that Sharpe could perform the representative sedentary jobs of dowel inspector, catcher, and lens inserter. R. 26-27.[4] The ALJ found that Sharpe was not disabled.

Sharpe appealed the ALJ's decision. On September 26, 2016, the Appeals Council denied Sharpe's request for review. The decision of the ALJ then became the final decision of the Defendant Commissioner. R. 1. Sharpe then brought this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. <u>Jens v. Barnhart</u>, 347 F.3d 209, 212 (7th Cir. 2003); <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation

---

[4] The ALJ's decision contains a typographical error; the ALJ misspelled "catcher" as "patcher." R. 27.

of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The RFC is supported by: (1) the objective tests and studies that showed either no impairments or only mild impairments; (2) the examinations of treating physicians and nurse practitioners that found only mild physical limitations on examination; (3) the consultative examination of Dr. Leung; (4) the testing of nurse practitioner Peterson that found Sharpe's memory to be within normal limits and Dr. Hafez' testing that found that Sharpe had mild cognitive impairments within normal limits; (5) the residual function assessments of Drs. Smith and Bitzer, and psychologists Drs. Mehr and

Story; (6) the evidence that Sharpe worked for several years with her mental limitations; and (7) the evidence of Sharpe's daily activities. The ALJ's decision is supported by substantial evidence.

Sharpe argues that the ALJ failed to provide a sufficient narrative explanation of his RFC determination. The Court disagrees. The ALJ gave a detailed explanation of his analysis of the evidence. R. 18-26. He explained in his conclusion, quoted above, how he crafted the RFC to reflect his analysis of the evidence. Sharpe argues that the ALJ erred in giving little weight to Dr. Froman's opinions. The Court again disagrees. Dr. Froman's findings were inconsistent with the other evidence in the record. Dr. Froman's finding were inconsistent with Dr. Hafez's testing that showed mild cognitive impairments within normal limits. The Court will not reweigh the evidence on this point. The ALJ's handling of Dr. Froman's opinions were supported by substantial evidence.

Sharp's counsel argues that the ALJ was "cherry picking" because the decision of the ALJ acknowledged that the record showed evidence that tremors in the Plaintiff's hands interfered with buttoning her clothing, while pointing out that when the Plaintiff was "totally at rest", she had no evidence of tremor. This argument ignores the additional evidence also considered by the ALJ. The ALJ indicated that the Claimant's treating

neurologist characterized the tremor as mild in severity and noted that it could be due to her asthma medications. The ALJ also noted that the Claimant was known to have improvement in her tremors with less asthma medication. Likewise, the ALJ noted that the Claimant saw a consultative examiner in 2014 who indicated that she had mild intentional tremors, but also indicated she could oppose the thumb and each finger and had 4/5 strength in both hands. R. 20. The argument also ignores the ALJ's consideration of the consultative examiner who, in 2014, noted that the Claimant had some right-sided weakness compared to her left, but she was able to manipulate small objects with her hands very well. R. 21. Again, the ALJ's evaluation of the evidence regarding frequent use of hands is supported by substantial evidence.

Sharpe argues that the ALJ's credibility findings were patently erroneous. The Social Security Administration has decided to stop using the term credibility in evaluating evidence about symptoms. SSR 16-3p, 2016 WL 1119029 at *1 (March16, 2016). Courts "generally defer to an agency's interpretations of the legal regime it is charged with administrating." Liskowitz v. Astrue, 559 F.3d 736, 744 (7th Cir. 2009). The interpretive rules set forth in SSR 16-3p apply retroactively to this Court's

review of the ALJ's decision in this case.  See Srp v. Colvin, 2016 WL 4487831, at *5 (C.D. Ill. August 25, 2016).

The ALJ's analysis met the requirements set forth in SSR 16-3p.  The Social Security Administration stated in SSR 16-3p that the adjudicator, such as the ALJ, must evaluate statements regarding the intensity, persistence, and limiting effects of pain in light of all of the evidence in the record, including the medical evidence.  The Social Security Administration stated, "We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings in the record." The Social Security Administration explained that when objective medical test results are not consistent with the individual's statement about his symptoms, the objective medical evidence "may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with the other evidence in the record."  SSR 16-3p, 2016 WL 1119029 at *5.

The ALJ found that Sharpe's claims of disabling pain were inconsistent with the medical evidence that showed a less severe condition. The ALJ similarly found that Sharpe's testimony about her mental functional limitations were inconsistent with medical evidence credited by

the ALJ.  The ALJ also found that Sharpe's daily activities were inconsistent with her testimony about the limiting effects of her impairments.  In light of this evidence, the Court cannot say that the ALJ's evaluation of Sharpe's statements regarding the intensity, persistence, and limiting effects of impairments were patently wrong.  See Pepper, 712 F.3d at 367.

Sharpe also criticizes the ALJ's assessment of the corroborative statement by Sharpe's daughter Adrian McCleery.  The ALJ's improperly assessed McCleery's truthfulness by noting that she was not disinterested, contrary to SSR 16-3p.  The ALJ's error, if any, was harmless.  The ALJ did not give significant weight to McCleery's statement because it was not consistent with "the preponderance of the opinions and observations by medical doctors in this case."  The ALJ could properly discount third-party statements because of a lack of support from the objective medical evidence.  SSR 16-3p, 2016 WL 1119029 at *5.  The ALJ's treatment of the statement by Sharpe's daughter is supported by substantial evidence.

THEREFORE, IT IS ORDERED THAT Defendant Commissioner's Motion for Summary Affirmance (d/e 16) is ALLOWED, Plaintiff Tammy L.

Sharpe's Brief in Support of Motion for Summary Judgment (d/e 13), is

DENIED, and the decision of the Commissioner is AFFIRMED.


ENTER:   February 15, 2018


*s/ Tom Schanzle-Haskins*
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE